Gary G. Colbath
First Asst. Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
188 W. Northern Lights Blvd., Suite 700
Anchorage, Alaska 99503
Phone: (907) 646-3400
Fax: (907) 646-3480
Email: gary_colbath@fd.org

*Counsel for Defendant Lucas Anthony Walker*

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> LUCAS ANTHONY WALKER, <br><br> Defendant. | Case No. 4:23-cr-00050-JDR <br><br> **DEFENDANT'S SENTENCING MEMORANDUM** |

Defendant Lucas Anthony Walker, through counsel, Gary G. Colbath, First Assistant Federal Defender, files this sentencing memorandum for the Court's consideration at sentencing.

### SENTENCING RECOMMENDATION

Defendant Lucas Walker requests a sentence of 360 months custody followed by 60 months of supervised release. This recommendation represents a substantial but warranted upward departure from the properly calculated guideline range and is the most severe sentence sufficient but no greater than necessary under the statutory sentencing factors set forth in 18 U.S.C. §3553(a).

## THE GUIDELINES

"All sentencing proceedings are to begin by determining the applicable Guidelines range. The range must be calculated correctly." *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008). Improperly calculating the Guidelines range constitutes "significant procedural error." *Id*. See also *Gall v. United States*, 552 U.S. 38, 49-51 (2007). Here, Mr. Walker fully agrees with the Probation Officer's calculation of the Guidelines. See Final "PSR" pp. 6-7.

### 1.  Base Offense Level

The proper Base Offense Level in this matter is 38 for each offense.  A Multiple Count Adjustment of +2 is properly added under U.S.S.G. §3D1.4.  This brings the Adjusted Base Offense Level to 40.

### 2.  Adjustments

As noted by the parties in the plea agreement and Probation in the PSR, Mr. Walker clearly and promptly demonstrated acceptance of responsibility for his offenses, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently. As such, and pursuant to the government's stated position in the plea agreement, Dckt. 53, Mr. Walker is entitled to a full three-level downward adjustment for acceptance of responsibility. *See* U.S.S.G. § 3E1.1.1.

### 3. Criminal History Computation

Mr. Walker agrees with the Probation officer's calculation of his Criminal History, noting that he has <u>no criminal convictions</u> and is in Category I. *See*, PSR p. 8 and U.S.S.G. § 4A.

### 4. Departures

Pursuant to the terms of the plea agreement, Mr. Walker urges to the Court to provide an upward departure from his guideline range to a sentence of 360 months. Departure of the requisite levels necessary to reach this sentence is appropriate under U.S.S.G. §§ 5K2.6 & 5K2.8. Mr. Walker used both a firearm and a knife during commission of the offenses. Moreover, given the conduct involved two elderly victims, his reaction to the situation and commission of the offenses is fairly characterized as "extreme" as contemplated by U.S.S.G. § 5K2.8 so as to warrant the requested departure.

### 5. Guidelines Range

As noted above, the PSR properly calculates Defendant's total Final Offense Level at 37 and his Criminal History Category at I, resulting in a final Sentencing Guideline range of 210-262 months. The Court should depart from the high end of this range only sufficient to reach a sentence of 360 months custody.

### 18 U.S.C. § 3553(a) - VARIANCES

Section 3553(a) requires a district court to impose a sentence that is "sufficient, but not greater than necessary," to achieve the goals of sentencing. *Kimbrough v. United States,*

552 U.S. 85, 90 (2007). "The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (emphasis in original). See also *Gall*, 552 U.S. at 48-50; *Rita v. United States*, 551 U.S. 338, 350-51 (2007). "[T]he sentencing court must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter." *Nelson*, 555 U.S. at 351. Mr. Walker submits that based on proper consideration of the relevant factors found in § 3553(a) including the guideline range and discussion herein above, the Court should provide a sentence of no more than 360 months.

### A. Lucas Walker's Personal History and Characteristics

Gage Staton[1] was a tortured child who never had a chance. He was born to the unwed union of an unstable, drug addicted mother, and an alcoholic, abusive father. Beginning from infancy, Lucas was abused and periodically abandoned by both his parents. This continued until his ultimate permanent adoption by his maternal grandmother when he was eight years old. However, by then he had developed severe and life-long-lasting trauma.

---

[1] In a further effort to escape his terrible childhood, when Lucas was formally adopted by his Grandmother, she allowed him to change his name and let him choose his new identity. Eight-year-old Gage Staton (at the time) changed his name to Lucas Anthony Walker, in large part based upon his admiration for the Star Wars character Luke Sky Walker and the movie series creator George Lucas.

*United States v. Lucas Anthony Walker*
Case No. 4:23-cr-00050-GKF                                                    Page 4

Lucas was initially in the custody of his mother, as she bounced in and out of cohabitating relationships with his father and other men. She was a domestic violence victim and addicted to several types of illegal drugs. Her drug use and dysfunctional relationships caused her to land in jail on a regular basis. His mother's legal episodes and her drug seeking behaviors caused Lucas to be left home alone or with strangers regularly as a baby. As he became a toddler, he would often be left in vehicles unattended for hours or locked in closets in random hotels or apartments where his mother stayed. He was malnourished, physically abused, and abandoned at some point almost daily.

As authorities became more involved in his mother's life, his biological father's identity was discovered and paternity established when Lucas was four or five years old. In a move to get Lucas away from the horrific circumstances of life with his mother, DHS placed six-year-old Lucas with his biological father despite the fact that he had never provided any care for Lucas up to that point in his young life. This change subjected young Lucas to almost worse trauma than he experienced with his mother.

The most significant trauma Lucas can remember happened during this period of his early childhood. He can remember being left in very dirty, bug infested homes and reviewing this part of his history still triggers emotional and angry feelings for him. He was also left for hours outside in his father's car at times as well. On other occasions his father would frequently take him to bars or parties and use him as "bait" to attract women to him, and then his father would discard Lucas wherever was convenient when the women joined him. His father also periodically cared for children of his paramours during this time

and during the second year Lucas was with him, authorities began an investigation of reports of child sexual abuse[2] by his father.  When Lucas was eight, his father was convicted of forcible sodomy and two counts of lewd or indecent proposals/acts to a child. He is currently serving life in the Oklahoma Department of Corrections.  *See* PSR ¶40.

Upon his father's arrest, DHS placed Lucas with his maternal grandmother, who eventually adopted him. Although he finally landed in a more stable and safer environment, he had suffered significant complex trauma that continued to plague him throughout his school age years and adolescence.  During this time, his grandmother and various schools he attended had him evaluated almost annually while he attended school under an Individual Education Plan (IEP) each year.  He was diagnosed with Oppositional Defiant Disorder, Trauma Stressor-related Disorder, Child Neglect, and Child Sexual Abuse victim, among other concerns.  He was provided individualized counseling services over a period of almost a decade by Bartlesville-area psychologist Andy Allen.[3]   Most significantly and relevant to this matter, Mr. Allen found that Lucas's overriding and most persistent condition he suffered from was Reactive Attachment Disorder.

In his mid-teens, Lucas began quite seriously abusing controlled substances and alcohol.  Although his offense conduct did not involve substance use, his use during his

---

[2]  The investigation involved allegations of abuse against children of both genders, including Lucas and half-siblings of his, born during prior relationships his father had with women other than Lucas's mother.

[3]  An interview with Mr. Allen and description of his treatment and work with Lucas – together with a summary of Lucas's history has been provided to the court for consideration.

teenage years certainly negatively effected his growth, maturity, and rational brain functioning. Rather than get appropriate mental health treatment or constructive help with his serious conditions, as he became a teenager and gained access to substances, Lucas self-medicated and avoided dealing with many problems in life by escaping through drug use and intoxication. Consequently, he did not develop any real coping mechanisms or healthy means of dealing with emotionally charged situations, relationship challenges or exigent crisis that arose in his day-to-day personal life. Lucas's perception of events, interactions, and others' motives were constantly miscolored by his traumatic past.

His early and persistent childhood abandonment and parental abuse left him feeling unloved and constantly craving love and affection from anyone who would show concern for him. His attachment disorder caused him to form relationships quickly, often inappropriately, and at many times obsessively/possessively. He lived in constant fear of future abandonment or loss of those who he quickly came to care for or who showed him affection. Such was the case with H.D. Although he only started "dating" her in October 2022, just a few months before the offenses here, he fell head-over-heels in love with her and pledged his long-term commitment to her almost as soon as their budding relationship began.

Lucas's past trauma and mental health conditions therefore speak volumes about his unplanned and extreme reaction to the circumstances giving rise to the offenses before the Court here. H.D. told him she was in danger. She told him she was abused in the past by the victims. She told him she was going to be "shipped away." She told him her situation

was dire, and he may never see her again.  Given his own history as a victim of abuse, abandonment, and trauma at the hands of those who were supposed to care for him, he was uncontrollably triggered by H.D.'s circumstances as related to him and terrified about the potential impact on them both.  He arrived at her house the night of the offenses and was just not equipped to appropriately deal with the situation he was unexpectedly drawn into.

Today, after some separation from the community and relationship stressors, Lucas is focused on the future and not his past.  He is hopeful to make positive and lasting changes for himself and use the Court's sentence for growth and rehabilitation by every means available to him.  He wants treatment.  He wants to finish his education.  He wants to learn a trade, or many trades.  He loves to read. He is an artist and enjoys computers, animation and video production, creation and editing.  He wants to serve his punishment in a safe, healthy and productive way so that he can immerge from this nightmare as healthy, mature, stable and useful as possible given his situation.  If given that chance by the Court, he is determined to succeed.

**B.  Nature and Circumstances of the Offense**

The nature of the offense is set forth in the PSR and was described by Mr. Walker in his allocution to the Court at his change of plea as well as within the factual basis of the plea agreement.  Consistent with each of those descriptions, this case culminated in Lucas's unplanned reaction to his fear of losing his girlfriend, the victims' grand-daughter, H.D. He feared for her safety and that the victims would physically send her away to another state, away from him and into further danger.  He was unexpectedly summonsed to the

*United States v. Lucas Anthony Walker*
Case No. 4:23-cr-00050-GKF                                                    Page 8

victims' home on the night of the incident by H.D.  She provided him a gun for protection. A confrontation with the victims' ensued and he caused each of their deaths during the ensuing moments.  It happened quickly, spontaneously and was done in just seconds of chaotic panic.

### C.  Need to Avoid Unwarranted Sentencing Disparity

When imposing sentence, this Court must avoid unwarranted sentencing disparities among similarly situated defendants convicted of similar offenses. 18 U.S.C. § 3553(a). This District and indeed the Tenth Circuit has a substantial volume of second-degree murder cases that are commensurate with the instant offense and in which sentences of less than 360 months in custody has been ordered.  Published research and statistics from the U.S. Sentencing Commission website show that sentences for murder convictions considered under U.S.S.G. § 2A1.2, the guideline applied here, resulted in sentences of less than 360 months custody in 75.4% of *all* cases – that is <u>across defendants in ALL criminal history categories, not just Category I like Mr. Walker</u>.  Thus, more than three fourths of *all* second-degree homicide cases result in sentences below the custody period contemplated by the plea agreement before the Court and requested by Mr. Walker here. Thus, a sentence of 360 months would certainly not result in sentencing disparity with other similarly situated defendants or cases of a similar nature.

### D.  Seriousness of the Offense, Deterrence, Public Protection

These offenses are unquestionably some of the most serious the Court encounters, two lives were lost. However, beyond the consequences to the victims, in determining how

punishment and deterrence should be applied, the age and mental state of the Defendant must be considered as paramount.

Lucas Walker was just 20 years old when he committed these offenses. He is only 22 years old today. He has yet to even fully develop into an adult, as formative processes are known to continue well into a person's twenties. A custody sentence spanning the next three decades in federal prison followed by five years of supervision uniquely tailored to Mr. Walker's conduct and circumstances will undoubtedly protect the public, send a clear message for deterrence regarding the federal sentencing consequences for this type of conduct, and reflects the seriousness of the offenses. However, a sentence of no more than 360 months also acknowledges Mr. Walker's young age and his prospects for future rehabilitation, and accounts for the influence of his traumatic past and mental health conditions that clearly impacted his actions here.

### E. Restitution

Pursuant to the plea agreement, Mr. Walker has agreed to pay restitution, as determined by the Court, to the victims' estates or representatives. When that is determined he will pay what is asked for and owed. Until then, this factor does not support a sentence beyond that which he requests.

### CONCLUSION

Lucas Walker cannot bring back the victims nor undo his actions the night of their deaths. He would if he could. What he can do is serve a lengthy period of federal prison time as punishment for his actions. During this time, he can and plans to undergo

significant mental and emotional health treatment, substance abuse treatment, and educational and vocational rehabilitation in order to help him mature and develop into a productive, stable, safe individual capable of functioning in society as a contributing community member.  Given that he is still in his early twenties there is every hope and opportunity for this to happen over the next two and half decades he will spend in prison serving a 30-year sentence.  Based on a starting guideline range of 210-262 months, in combination with the § 3553(a) factors discussed in the PSR, along with the above-mentioned argument and analysis, his sentencing request for a custody sentence of 30 years followed by five years of supervised release is "sufficient, but not greater than necessary" in this case.

DATED at this 16th day of January, 2025.

Respectfully submitted,
FEDERAL PUBLIC DEFENDER
DISTRICT OF ALASKA

*/s/ Gary G. Colbath*
Gary G. Colbath
First Assistant Defender

Certificate of Service:
I hereby certify that I electronically filed the foregoing and any attachments with the Clerk of Court for the United States District Court for the Northern District of Oklahoma by using the district's CM/ECF system on January 16, 2025. All participants in this case are registered CM/ECF users and will be served by the district's CM/ECF system.
*/s/ Gary Colbath*

*United States v. Lucas Anthony Walker*
Case No. 4:23-cr-00050-GKF                                                      Page 11